I'M A PATENT ATTORNEY IN SEATTLE, WASHINGTON, AND I ACTUALLY WROTE THIS APPLICATION. I'M NOT A LITIGATOR, AS YOU MAY HAVE ASCERTAINED FROM THE BRIEFING. WELL, YOU HOLD GOOD STANDING BEFORE THE WASHINGTON STATE BORROWER. YES, OF COURSE. SO AT PAGE 47 OF THE BLUEBRIEF, YOU SAY SOME OF THE BOARD STATEMENTS ARE CLEARLY AND OBVIOUSLY FALSE. AND AS A MEMBER OF THE WASHINGTON STATE BORROWER, YOU KNOW UNDER WASHINGTON STATE RULES OF PROFESSIONAL CONDUCT 8.3, THAT A LAWYER WHO KNOWS THAT ANOTHER LAWYER HAS COMMITTED A VIOLATION THAT RAISES A SUBSTANTIAL QUESTION AS TO THAT LAWYER'S HONESTY SHOULD INFORM THE APPROPRIATE PROFESSIONAL AUTHORITY. HAVE YOU FILED A COMPLAINT FOR THE EXAMINER'S MISCONDUCT IN MAKING A STATEMENT THAT WAS CLEARLY AND OBVIOUSLY FALSE? NO, I HAVEN'T. ISN'T IT YOUR OBLIGATION TO DO SO? WELL, I THINK IT'S OFTEN THE CASE THAT AN ATTORNEY MAY MISREAD A DOCUMENT OR NOT UNDERSTAND THE FACTS AND MAKE A FALSE STATEMENT. BUT YOU ACCUSE THE ATTORNEY OF DISHONESTY. I DON'T THINK SO. I THINK A STATEMENT CAN BE FALSE AND CAN BE MADE HONESTLY IN ERROR. YOU MAY PROCEED. YOU MEANT TO SAY IT WAS INCORRECT. YES. TO ME, FALSE AND INCORRECT ARE SYNONYMOUS. SO THE MAIN THRUST OF MY ARGUMENTS THROUGHOUT THE APPEALS IN THIS CASE IS THAT THE USPTO DID NOT PROVIDE ANY EVIDENCE FOR THE 35 U.S.C. SECTION 101 REJECTIONS. I POINTED THAT OUT IN THE... YOU DIDN'T INVENT ORTHOGONAL ARRAYS, CORRECT? NO. OR THEY'RE USED ON COMPUTERS. NO. THERE WERE OTHER... IN FACT, THE EXAMINERS CITED SOME PRIOR ART WHERE THEY USED ORTHOGONAL ARRAYS TO GENERATE EXPERIMENT DESIGNS ON A COMPUTER. HOWEVER, THERE'S A LOT OF DIFFERENCES BETWEEN WEBTRAN'S PRODUCT AND THE PRE-EXISTING ONES. DO THE CLAIMS HERE CLAIM THE CREATION OF NEW ORTHOGONAL ARRAYS TO ADD TO THE LIBRARY FROM WHICH A USER MIGHT SELECT? THE INDEPENDENT CLAIM DOES NOT. I CAN'T RECALL NOW IF ONE OF THE DEPENDENT CLAIMS DOES. WE DO DESCRIBE THAT IN THE SPECIFICATION. EXCUSE ME? BUT THOSE HAVE NOT BEEN ARGUED SEPARATELY, RIGHT? NO. OKAY. SO, WHAT WE HAVE HERE IS A LIBRARY OF PRE-EXISTING ORTHOGONAL ARRAYS WHICH ARE COMMONLY USED FOR TEST DESIGN. RIGHT. AND THE CLAIM HERE FOCUSES ON A USER DECIDING WHAT CRITERIA TO USE TO SELECT FROM THIS LIBRARY. NOT EXACTLY. IT TURNS OUT, AND I DESCRIBE THIS IN THE APPLICATION, IF YOU LOOK AT THE ENTIRE EXPERIMENT DESIGN SPACE, IT'S ENORMOUS. THERE'S ONLY 117,000 KNOWN ORTHOGONAL ARRAYS. THERE'S BILLIONS OF POSSIBLE EXPERIMENTS. SO IT'S ALMOST IMPOSSIBLE TO FIND AN ORTHOGONAL ARRAY THAT MATCHES YOUR DESIGN PARAMETERS. SO WHAT YOU DO IS YOU TRY TO FIND AN ORTHOGONAL ARRAY THAT YOU CAN MODIFY IN ORDER TO PRODUCE THE EXPERIMENT DESIGN THAT YOU SPECIFY WITH THE DESIGN PARAMETERS. AND IT'S A COMPUTATIONALLY DIFFICULT PROBLEM. AND BY THAT, I MEAN THERE'S NO KNOWN ALGORITHM FOR DOING THIS EFFICIENTLY. IT'S A COMBINATORIALLY INTRACTABLE PROBLEM. SO WHAT WEBTRANDS DID IS THEY'VE USED A LOT OF TECHNIQUES. AND MOST OF THESE INVOLVE THE TEMPLATES THAT ARE ASSOCIATED WITH THE ORTHOGONAL ARRAYS IN ORDER TO RECORD A LOT OF DATA PRIOR TO SEARCHING FOR MATCHING ORTHOGONAL ARRAYS TO FACILITATE THE SEARCH. THE TEMPLATE ALSO INCLUDES A SIGNATURE THAT ALLOWS YOU TO RAPIDLY COMPARE THE EXPERIMENT DESIGN PARAMETERS TO THE EXPERIMENT DESIGNS REPRESENTED BY THE TEMPLATES. AND IN THE PROCESS OF ACTUALLY GENERATING THESE TEMPLATES, WHICH IS ALL DESCRIBED IN THE APPLICATION, THEY USE A LOT OF HEURISTICS SO THAT YOU DON'T DO A COMBINATORIAL CROSS-PRODUCT. YOU DON'T GENERATE ALL POSSIBLE TEMPLATES, BUT ONLY A PROMISING SUBSET SO THAT, AGAIN, THE SEARCH IS EFFICIENT. PRIOR TO WEBTRANS, IT COULD TAKE HOURS, DAYS, ENORMOUS AMOUNT OF TIME TO TRY TO FIND AN OPTIMAL EXPERIMENT DESIGN BASED ON ORTHOGONAL ARRAYS. WEBTRANS IS ABLE TO DO IT IN ABOUT A SECOND. SO IT ACTUALLY FACILITATED USE OF ORTHOGONAL ARRAYS FOR EXPERIMENT DESIGN IN PRACTICAL SITUATIONS, INCLUDING WEB TESTING EXPERIMENTS WHERE THINGS ARE DONE PHOTOGRAPHICALLY. Can you help clarify for me which language in the claims addresses the question of finding the best arrays that So the independent claim sort of follows the initial flow diagram in the application. So identifying matching orthogonal arrays in a database of orthogonal arrays. And matching really means? It means, no, it means, this is described in a dependent claim. I believe it's claim two or three. Matching means finding orthogonal arrays that would be suitable to modify in order to generate the experiment design you're looking for. So they don't match in the sense that the orthogonal array itself is not the experiment design you're seeking, but it can be modified in order to do that. Here, if we go to step two, what's your proposed inventive concept? Is it the templates? Yes. I mean, there's quite a few inventive concepts here. But in drafting the claims, I started out with a reasonably broad claim. And most of the innovation does reside in the templates. Were they used in the prior? No. No, in fact, the PTAB found that the 103 rejections were invalid. They identified no use of templates anywhere in the prior art. So they are unique from everything I know. Is there anything else? I'm trying to drill in. Other than the templates, is there anything else that you say constitutes the inventive concept? Well, so templates are a complex data structure. They include a bunch of different tables and data. And the signature within the template is highly critical for the efficiency of this method. And the signature allows one to rapidly compare your design parameters to a experiment design encoded within a template so that you can quickly search. Otherwise, the searching is very time consuming. And you have to, I mean, there can be literally thousands of different possible modifications of any given orthogonal array. So this technique increases the efficiency to allow you to find optimal or near optimal experiment designs in under a second versus days or weeks or even longer periods of time. So it very much increases the efficiency of the computational approach to generating experiment designs. And do you want to reserve the balance of your time? Yes, I would. Is it Mr. Resilla? Resilla, that's correct. Thank you. May I please report to Brian Resilla for the appellee? As the examiner in the board recognized and concluded web trends claims are broadly directed to abstract ideas and the application of abstract ideas on generic computers. This renders the claims patent ineligible under section 101. What would an appellant have to add to claim one to bring it within the realm of patent eligible subject matter? He would have to, I think, there's probably not much that he could do to save it under step one because the claim is directed to the abstract idea of identifying and collecting information. He can do that with pencil and paper. Exactly. So then he would have to do something under step two. So he would have to identify something that was not conventional, well understood, or routine. Well, he says the examiner erred in his understanding of template. And counsel says that's the inventive concept. Well, I think what the board did here was the correct analysis. The board looked to first found under step one that it was directed to abstract ideas. And then under step two, it looked to see if any of the additional elements, whether together as an ordered combination or individually, provided anything beyond any inventive concept beyond those abstract ideas. And the board looked to the claim language itself. And the additional elements were a computer system and the stored program. That computer system and the stored program, there's no information in the claims about any specificity of those computers. And then it looked to the specification. In the specification, there's an acknowledgment that the identification steps and the assignment steps that are recited in claim one could be done on various types of computer systems. So acknowledging that it could be done on generic computer. So looking to the previous case law of this court, because the claims are directed to abstract ideas and basically just tells the practitioner to apply them on a generic computer, that cannot save it from the ambit of being an abstract idea and not patent-eligible under 101. With respect to the argument about the templates, again, the language of claim one is very broad. And it just says identifying templates and assigning factors and interactions to columns in the templates. Again, this court has found that collection and analysis of information is directed to abstract ideas. And there's no detail on. So what could, we'll go back to my question, what could he have done? He would have to, perhaps, looking at some of the other case law before this court, identify some kind of interactive display or something that was not conventional. He could have claimed, perhaps, if there was a non-conventional arrangement of the memory and computer system and program, he could have claimed that. But I would submit that the specification just doesn't provide support for that. What if he identified a new way of making the selection of a orthogonal array that, using the introduction of some sort of measure, a distance measure, enabled one to find something that one would never have been able to find before? I think we would have to go through the analysis to see whether or not that process was something that could be done by human on pen and paper, or whether it was a mental process, how that was applied on the computer. If it's just generically applied on a computer. Well, a computer can do anything. So the entire innovation here is actually doing various kinds of data analysis and probability analyses and introducing a measure of distance so that you want to get, in some mathematical sense, the closest thing. And nobody had ever been able to make the selection process that efficient before. Would that count? It's like creating a new search tool. I don't think so under that hypothesis, because just merely claiming improved speed or efficiency is not enough to take it out of the ambit of being an abstract idea. Why not? Why not? Because, again, in this case, running an old algorithm really, really fast might well be different from running a new algorithm that enables you to find what would otherwise take 6 billion years to find. But the Supreme Court analysis told us that just taking processes that could be done. Nobody has ever run, in my hypothesis, this new algorithm. That's what makes it new. The Supreme Court has also found that a new algorithm run on a generic computer would still be patent ineligible under the abstract idea. Where? In Alice and in Mayo. The court said that the application. Alice didn't involve algorithms. So, I'm sorry, in Mayo, the court said that. Mayo didn't involve algorithms. That involved a new discovery of what the body does with particular substances. Of a mathematical. Is that the use of a? Mayo? The use of a mathematical. Well, let me circle back to the second point of your question, which was the application of a new algorithm. If that algorithm is based on mathematical principles that could be done as a mental process, but the computer allows it to be done more efficiently or quicker than if that's an abstract idea, the increasing the speed of it doesn't take something that's already an abstract idea and take it out of that ambit. Now, part of your hypothesis was this idea about a distance vector, which may be some kind of new information or something that might be patentable, depending on how it's claimed by the applicant. Because that might be something that has never been discovered before or something that a human being would be unable to do using algorithms. Do you have something further? If there's no further questions. Thank you. So my main complaint, again, is no evidence has been provided by the USPTO to support the Alice test or the 35 USC section 101 rejections as a whole. I can't find any evidence in the examiners for conclusory statements, and I find no evidence in the board decision. They're simply conclusory statements. It's easy to say that something is an abstract idea or that the fundamental building block, in this case, is the use of. Put aside fundamental building block. I mean, I took it that the fairly simple point here is that if you look at claim one, the language of template is so broad that it doesn't require any evidence, because it's not a point about facts in the world, to say that is at a level of generality that is definitionally abstract. And that's the only locus of innovation in this claim. I still maintain under the APA that some kind of evidence needs to be cited. It's not a fact. It's not a fact question. Why would you need evidence? What you need evidence about is states of fact in the world, like whether something that is not abstract, a particular computer, was routine, conventional. But to characterize a template where it's not defined except at this extremely high level of generality, that's not a fact about the world. That's about the meaning of the term template. But bear in mind that all of the aspects of the template are claimed in the dependent claims. But you didn't argue the dependent claims separately. I have argued throughout the briefing that all of the claims were summarily rejected without evidence. And there's no indication that any of the details in the dependent claims, or even the template itself, was considered in the decision. They talk about the fact that we were rejected without evidence. What evidence exactly? Well, for example, the identified abstract concept here is the use of something, mathematical use of orthogonal arrays for experiment design. Where is the evidence that this is in any way mathematical? We don't agree to that. Forget about the term mathematical. It's just selecting information that's sitting in a library. What did you say, 117,000 members in this library? Currently. Selecting the ones you want. What more is in this claim? Except doing it extremely fast, because the library is fairly big, and you may have a complicated set of selection criteria. The thing that allows me to increase the efficiency so much is the fact that I associate these templates with the orthogonal array in the database. This isn't so unlike the EnFISH case, where there was a self-referential table that was added to the database, and that increased the efficiency of the system. It's the same thing. That template includes enough information to make my search incredibly fast, versus the pre-existing attempts to use orthogonal arrays computationally. You have anything further, counsel? It seems to me, again, from reading the case law, that the Alice two-part test is the prima facie case for asserting a judicial exception. And prima facie case, to me, means there's an evidentiary burden that the examiner must meet. I don't see, again, any evidence cited anywhere in this rejection. So even if you say that the template is a data structure, but if you say it's just information or whatever, I still think you need to cite some kind of evidence for these propositions. Thank you, counsel. The matter will stand submitted.